BWB:KVH
F.#2011R01764

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SEALED AFFIDAVIT IN
SUPPORT OF SEARCH
WARRANT

------------------------------------X

UNITED STATES OF AMERICA

    - against -

THE PREMISES KNOWN AND DESCRIBED AS
35-05/35-11 FARRINGTON STREET,
FLUSHING, NEW YORK 11354.

(T. 18, U.S.C., §§
982(a)(7),1347,
1349, 2 and 3551
et seq.)

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ **NOV 10 2011** ★

BROOKLYN OFFICE

------------------------------------X

EASTERN DISTRICT OF NEW YORK, SS:

      ASHLEY OBLAK, being duly sworn, deposes and says that she is a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), duly appointed according to law and acting as such.

      1.  I have been a Special Agent with HHS-OIG for approximately fifteen months.  I currently am assigned to investigate health care fraud violations, including schemes to defraud the Medicare and Medicaid programs.

      2.  During my tenure with HHS-OIG, I have participated in a variety of criminal health care fraud investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, executed search warrants and reviewed Medicare and Medicaid claims data, bank records, phone records, Medicare and Medicaid beneficiaries medical records, invoices, and other business records.  I am familiar with the records and

documents maintained by health care providers and the laws and regulations related to the administration of the Medicare and Medicaid programs.

3. Among other duties, I am now participating in an investigation relating to allegations of violations, and attempted violations, of Title 18, United States Code, Section 1347 (Health Care Fraud) and Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud), inter alia, by Ho Kim, Hoi Yat Kam, Elaine Kim, also known as So Ryang Kim, John Knox, Peter Lu, Gilbert Kim, and others known and unknown.

4. This Affidavit is submitted in support of an application for a warrant to search the business known as URI Medical Service PC ("URI"), located at 35-05/35-11 Farrington Street, Flushing, New York 11354 (the "SUBJECT PREMISES"), as more fully described in Attachment A. Based on the facts set forth in this Affidavit, I respectfully submit that there is probable cause to believe that there presently is located in the SUBJECT PREMISES certain items and property, which are more fully set forth in Attachment B, which include, but are not limited to, records, files, correspondence, memoranda, computers, computer drives/disks, bank and other financial records, data and other materials, all of which constitute evidence, fruits and instrumentalities of violations, and attempted violations of, inter alia, 18 U.S.C. § 1347 and 18 U.S.C. § 1349.

2

5.    I personally have participated in the investigation of the offenses described above, and am familiar with the relevant facts and circumstances.  The facts and information contained in this Affidavit are based upon my knowledge and observations, information obtained from records discovered in the course of this investigation, information from other experienced HHS-OIG and Federal Bureau of Investigation ("FBI") agents, information gained from my training and experience, and information obtained from an undercover source described below as the "UC" and from a confidential source described below as "Individual One."  Because this Affidavit is being submitted for the limited purpose of seeking a search warrant, I have not set forth each and every fact learned during the course of this investigation, but simply those facts that I believe are necessary to establish probable cause to support the issuance of a search warrant of the SUBJECT PREMISES. Except where otherwise noted, all conversations described in this Affidavit are set forth in part and in substance only.

**THE SUBJECT PREMISES**

6.    The SUBJECT PREMISES is located in a two-story tan building on 35-05/35-11 Farrington Street, Flushing, New York between 35th Avenue and Northern Boulevard.  The entrance door clearly marks "35-05 and 35-11 " in white writing to the left of the glass door.  Above the main entrance is a sign containing the words, "United Disabilities Welfare Center." Located on top of the

3

tan building is a large white sign containing the words, "URI Medical Center," and located to the left of the tan building is large rectangular sign containing the words, "URI Medical Center."

## BACKGROUND

7.    The Medicare program ("Medicare") was a federal health care program providing benefits to individuals aged 65 and over and to certain disabled persons.  Medicare was administered by the Centers for Medicare and Medicaid Services, a federal agency under the United States Department of Health and Human Services.  Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."  The physician who provided a service to a beneficiary or ordered that a service be provided to a beneficiary was referred to as a "rendering physician."

8.    Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

9.    Medicare included coverage under several components, including hospital insurance ("Part A") and medical insurance ("Part B").  Medicare Part B covered the costs of physicians' services and outpatient care, including physical therapy, occupational therapy and diagnostic tests.  Medicare Part B covered these costs only if, among other requirements, they were medically necessary and ordered by a physician.

4

10.   A medical provider certified to participate in Medicare, whether a clinic or individual, was assigned a provider identification number ("PIN") for billing purposes.   A medical provider rendering a service was required to use its assigned PIN when submitting a claim for reimbursement to Medicare.

11.   A medical provider was permitted to submit claims to Medicare only for services actually rendered and was required to maintain patient records verifying the provision of services.

12.   To receive reimbursement for a covered service from Medicare, a medical provider was required to submit a claim, either electronically or in writing.   The claim had to include information identifying the medical provider, the rendering physician, the patient and the services rendered.   By submitting the claim, the provider was certifying, among other things, that the services were rendered to the patient and were medically necessary.

13.   Medicare provider claims included "billing codes," which were numbers that referred to specific descriptions of medical services.   Medicare reimbursed medical providers a set fee for many billing codes.

14.   URI Medical Center, PC ("URI") is a New York State corporation doing business in Flushing, New York.   URI is certified to participate in Medicare.   URI is a medical clinic that supposedly provided, among other things, physical therapy to

5

Medicare beneficiaries. Ho Kim is listed on URI's corporate documents as the Chairman/CEO at URI. The SUBJECT PREMISES is the address listed on URI's corporate documents.

## FACTS SUPPORTING PROBABLE CAUSE

15. Under 18, U.S.C. § 1347, it is illegal to defraud Medicare or to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money under the custody or control of Medicare. In addition, 18 U.S.C., § 1349, it is illegal to conspire to execute a scheme and artifice to defraud Medicare.

16. Based on the facts set forth herein, there is probable cause to believe that Ho Kim, Hoi Yat Kam, Elaine Kim, also known as So Ryang Kim, John Knox, Peter Lu and Gilbert Kim, have engaged in fraudulent activity at the SUBJECT PREMISES and that most, if not all, of the claims they submitted to Medicare were false and fraudulent.

## Fraudulent Scheme

17. From approximately March 2007 to October 2011, Ho Kim, Hoi Yat Kam, Elaine Kim, also known as So Ryang Kim, John Knox, Peter Lu and Gilbert Kim offered services such as massages, facials, lunches, and dancing classes to Medicare beneficiaries at the SUBJECT PREMISES in exchange for the beneficiaries allowing their Medicare numbers to be billed for medical services that were never received and were not medically necessary. Medicare beneficiaries were seen by various providers at the SUBJECT

6

PREMISES, including, Ho Kim, Hoi Yat Kam, John Knox and Peter Lu who prescribed services, such as physical therapy, electric stimulation treatments and chiropractic manipulation services. In reality, the services were not medically necessary and were not provided.

18.   Ho Kim, Hoi Yat Kam, Elaine Kim, also known as So Ryang Kim, John Knox, Peter Lu, Gilbert Kim, together with others, caused the submission of false and fraudulent claims to Medicare through URI's group PINs and John Knox's and Peter Lu's individual PINs for services purportedly provided to Medicare beneficiaries that were not rendered and for services that were not medically necessary.

19.   Between March 2007 and October 2011, URI caused the submission of approximately $7.2 million in false and fraudulent claims to Medicare and was paid approximately $4.9 million from Medicare for those claims.   In addition, two individual providers (Peter Lu and John Knox) both listed the SUBJECT PREMISES as their practice location and submitted claims to Medicare under their individual PIN.   Between June 2009 and September 2011, Peter Lu submitted approximately $1.3 million in false and fraudulent claims to Medicare and was paid approximately $1 million for those claims. Between April 2008 and October 2011, John Knox submitted approximately $1.7 million in false and fraudulent claims to Medicare and was paid approximately $1.2 million for those claims.

7

### Medicare Provider Enrollment Applications

20.    On or about March 1, 2007, URI's Medicare Provider Application (Form CMS-855) was signed by Ho Kim. The SUBJECT PREMISES is the address listed as both the correspondence address and the practice location on the application.

21.    In addition, Peter Lu listed the SUBJECT PREMISES as his practice location on his Medicare enrollment application. The SUBJECT PREMISES was also the address listed on correspondence between Medicare and John Knox in connection with an audit of Knox's claims to Medicare.

### Medicare Claims

22.    Affiant analyzed the Medicare claims data for URI. Nearly every beneficiary is billed for a bundled group of four claims: three for physical therapy and one for electric stimulation. The diagnosis code 715.16 (arthritis in lower leg) was used on 83% of the claims.

23.    In 2010, SGS (a Medicare contractor) wrote a letter to HHS-OIG notifying the agency of various fraudulent billing patterns at URI. For example, SGS noted that, "The provider's billing indicates a static set of physical therapy procedure codes and selective diagnoses codes billed to Medicare." SGS noted that in 2008, an 84 year old psychiatrist, and the top rendering provider at URI, billed for physical therapy services nearly every day, with an average of 51 visits per day.

8

24. Further analysis of the URI claims data reveals that 78 beneficiaries have the same address in Yonkers, New York, which is a large apartment building, and in the morning rush hour is an hour's drive to the SUBJECT PREMISES. It is almost impossible to believe that this many beneficiaries in one apartment complex, located an hour from the clinic, would all need the same physical therapy. Indeed, according to the Medicare claims data, 82% had the same diagnosis code of 715.16 – which refers to arthritis in the lower leg.

### Bank Records

25. Affiant analyzed URI's bank records for the account where Medicare deposits reimbursement monies. Ho Kim, Elaine Kim, Gilbert Kim, Robert Kim, and Michael Byun are all listed as signatories on the account.

26. Based on my review of the bank records, the Medicare money deposited into the URI account is primarily funneled to two management companies, URI Total Care Management and Roesal Management of Flushing, LLC, that both have the SUBJECT PREMISES as the address on their bank statements.

### Undercover Investigation and Activity

27. In the summer of 2011, HHS-OIG and the FBI initiated an undercover investigation of URI in which an undercover operative ("UC"), posed as a Medicare beneficiary.

9

28.   Between July 2011 and September 2011, the UC made a twelve visits to the SUBJECT PREMISES.   All of the visits were recorded.   The UC also made four visits to URI's sister clinic, Sarang Medical, PC ("Sarang") during this same time period.

29.   On the UC's first visit to the SUBJECT PREMISES on July 21, 2011, the UC presented his Medicare card to a woman at the front desk.   The UC received four stickers/tickets: one for a back rub, one for a facial, one for a foot massage, and one for a meal. The UC then went to a room at the SUBJECT PREMISES and received a facial and a back massage.   A review of claims data submitted to Medicare for the UC's visit on July 21, 2011 reveals that two providers (John Knox and Peter Lu) at the SUBJECT PREMISES submitted claims for lesion removal, physical therapy, and electric stimulation treatment, and chiropractic manipulation.   The UC received none of these services.

30.   The UC returned to the SUBJECT PREMISES eleven more times over the course of the summer and fall of 2011.   Each visit consisted of receiving either a facial or a foot or back massage.

31.   The UC received a total of seven foot massages, seven back massages, 4 facials, and one hearing test at the SUBJECT PREMISES.   The UC also had two short doctors' appointments.   A review of the Medicare claims data (which was submitted to Medicare as recently as October 26, 2011) indicates Medicare was billed for physical therapy services, electric stimulation treatments,

chiropractic services, and lesion removals. The UC received <u>none</u> of these services.

32.   On August 19, 2011, due to a high volume of patients at the SUBJECT PREMISES, the UC did not receive any treatments. Medicare was billed by both Peter Lu and John Knox for services on that date.

33.   Medicare was billed over $2,300 for the UC's visits to the SUBJECT PREMISES.

34.   In addition to receiving massages and facials at the SUBJECT PREMISES, the UC was also given meal tickets that could be redeemed at a buffet line in the basement area of the SUBJECT PREMISES.

35.   The URI clinic also provided "free" dancing, computer, and music lessons for Medicare beneficiaries in the basement area of the SUBJECT PREMISES.  During one visit, the UC captured an announcement made over the intercom system during lunch.  The announcement indicated that while free services were provided at the SUBJECT PREMISES, "All of the expenses are covered by the government program.  The cost for whatever you do here is a relatively small amount.  The price of an overnight stay at the hospital is more than enough to cover your entire years' worth of cost for the treatment you receive here.  Please don't think you are helping the government save money by not receiving the treatment."

11

36.   Medicare beneficiaries who attended the SUBJECT PREMISES were also given tickets if they saw a doctor.   The announcer described above explained, however, that "the tickets are only issued after you are seen by a doctor.   You can't ask for a ticket every time you've had your facial treatment and/or acupuncture session."

37.   According to the UC, the tickets described above could be redeemed for bags of rice, shopping carts, and also a "grand prize" trip to a farm.

## Individual 1

38.   In or about March of 2011 and continuing through to October 2011, HHS-OIG agents interviewed an individual who was employed by URI as a front desk receptionist and office worker(hereinafter "Individual 1").

39.   Individual 1 told agents about various fraudulent activities that occurred at the SUBJECT PREMISES, including the fabrication of patient files (which were done using a computer) in order to comply with a Medicare audit.  Individual 1 also told agents that URI submits claims to Medicare for physical therapy when patients are actually receiving massages and facials.   In addition, Individual 1 stated that URI submitted bills to Medicare when no services were provided to Medicare beneficiaries.

12

40.   Individual 1 also told agents that there was an office at the SUBJECT PREMISES shared by Elaine Kim and Gilbert Kim that contained a computer.

41.   Based on the above, I believe there is probable cause to believe that Ho Kim, Hoi Yat Kam, Elaine Kim, also known as So Ryang Kim, John Knox, Peter Lu and Gilbert Kim have engaged in criminal conduct, including health care fraud and conspiracy to commit health care fraud at the SUBJECT PREMISES and that evidence, fruits, and instrumentalities  of these offenses are currently located at the SUBJECT PREMISES.

## BUSINESS RECORDS

42.   Based on my knowledge, training and experience, and the experience of other law enforcement officers, I have knowledge of common business practices.  In particular, I am aware that businesses routinely document and maintain records of their operating accounts - both in hard copy and electronically - including the receipt, expenditure and accounting of business funds.  Businesses also maintain detailed records of their business activities, including with respect to vendors, customers, lenders and employees. As such, there is probable cause to believe that there will be located at the SUBJECT PREMISES business records documenting  interactions  and  communications  regarding  the fraudulent scheme.

13

43.   Based on my knowledge, training, and experience, businesses billing Medicare and Medicaid also routinely maintain records of patient files, bills, invoices, and claims for payments/reimbursements for services billed, provided, or alleged to have been provided.   Documents include reimbursement claim forms, explanations of medical benefits, detailed written orders or prescriptions, certificates of medical necessity, information from the treating physician concerning the patients' diagnosis, proof of delivery of services and/or items that were submitted by any representative acting on behalf of URI or for reimbursement by Medicare and Medicaid.

44.   Medicare and Medicaid rules require that providers such as URI that bill electronically maintain documents supporting their claims for several years after the claims are paid.

45.   Based on my knowledge, training, and experience, businesses billing Medicare and Medicaid also retain contracts, agreements, papers, and affiliated records pertaining to the provision of diagnostic services, including manufacturer catalogs, purchase orders, invoices, and receipts.

46.   Based on my knowledge, training, and experience, businesses billing Medicare and Medicaid also retain letters relating to efforts to collect co-payments and deductibles from individuals that receive health care coverage from Medicare and Medicaid.   In addition, businesses retain correspondence and

14

cancelled checks relating to notices of overpayment and requests for refunds from Medicare and Medicaid. Businesses billing Medicare and Medicaid also have correspondence to and from Medicare and Medicaid including, but not limited to, manuals, advisories, newsletters, bulletins, and publications. Businesses also retain correspondence to and from patients regarding Medicare and Medicaid.

47.   Based on my knowledge, training, and experience, the financial books, records and documents constituting bank accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds, or bund funds, including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, credit card, ATM, and debit card accounts are also retained by businesses.

48.   Based on my knowledge, training, and experience, contracts, agreements, logs, lists or papers affiliated with any medical professional services, referrals, or storage, including records of payment, are also retained by businesses.

49.   Based on my knowledge, training, and experience, medical clinics often hire multiple sales representatives. Therefore, files listing any and all employee names, addresses, telephone numbers, and background information for all current and former employees are relevant.

50.    Based on my knowledge, training, and experience, medical clinics often hire outside medical insurance billing companies.   Therefore, all contracts, agreements, or paper affiliated with these companies are relevant.

**SPECIFICS REGARDING THE SEIZURE AND SEARCHING OF COMPUTER SYSTEMS FOUND ON THE SUBJECT PREMISES**

51.  Based on Affiant's review of UC's audio and/or videotapes, there are multiple computers at the SUBJECT PREMISES. Based on Affiant's training and experience, businesses often store documents on their computers that are relevant to investigate a fraud scheme.   These documents include business plans, correspondence, spreadsheets of expenses and revenue, invoices, meeting minutes, among other things.   There is probable cause to believe that the computers at the SUBJECT PREMISES contain documents related to the fraud scheme.

52. Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including hard disk drives, floppy disks, compact disks, magnetic tapes, memory chips and other portable and removable media.   I also know that during the search of the premises, it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

16

a. Searching computer systems is a highly technical process, which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer software application or operating system that is being searched.

b. Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of a premises. A single megabyte of storage

17

space is the equivalent of 500 double-spaced pages of text. A
single gigabyte of storage space, or 1,000 megabytes, is the
equivalent of 500,000 double-spaced pages of text. Storage devices
capable of storing 160 gigabytes ("GB") of data are now commonplace
in desktop computers. Consequently, each non-networked, desktop
computer found during a search can easily contain the equivalent of
80 million pages of data, which, if printed out, would result in a
stack of paper over four miles high.

   d.  Computer users can attempt to conceal data
within computer equipment and storage devices through a number of
methods, including the use of innocuous or misleading filenames and
extensions. For example, files with the extension ".jpg" often are
image files; however, a user can easily change the extension to
".txt" to conceal the image and make it appear that the file
contains text. Computer users can also attempt to conceal data by
using encryption, which means that a password or device is
necessary to decrypt the data into readable form. In addition,
computer users can conceal data within another seemingly unrelated
and innocuous file in a process called "steganography." For
example, by using steganography a computer user can conceal text in
an image file which cannot be viewed when the image file is opened.
Therefore, a substantial amount of time is necessary to extract and
sort through data that is concealed or encrypted to determine
whether it is evidence, contraband or instrumentalities of a crime.

e.    Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little to no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools.  When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.

f.    In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or

19

viewed than on a particular user's operating system, storage capacity, and computer habits.

53. In light of these concerns, I hereby request the Court's permission to search, copy, image and seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the image or hardware for the evidence, fruits, and instrumentalities of violations of the specified Federal Offenses.

## THE APPLICATION FOR A SEARCH WARRANT

54. Based on all of the foregoing facts, there is probable cause to believe that a search of the SUBJECT PREMISES will lead to the discovery of the items outlined above (described more fully in Attachment B, incorporated by reference herein), which items constitute evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. §§ 1347 and 1349.

## CONCLUSION

55. Based on the above information, there is probable cause to believe that the specified federal offenses have been violated. Accordingly, this Affiant respectfully requests that this Court issue a search warrant for the SUBJECT PREMISES, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, which constitute evidence,

contraband, fruits, and other items related to violations of the specified federal offenses.

56.   It is further respectfully requested that this Court issue an Order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application, Affidavit, and Search Warrant, and the requisite inventory notice (with the exception of one copy of the warrant and the inventory notice that will be left at the SUBJECT PREMISES). Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation, and premature disclosure of the contents of this Affidavit and related documents may have a negative impact on this continuing investigation and may jeopardize its effectiveness.

21

WHEREFORE, Affiant prays that a warrant be issued, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, to search the SUBJECT PREMISES for the items and information set forth in Attachment B.

ASHLEY OBLAK
Special Agent
Department of Health and Human Services

Sworn to before me this _____ day of November, 2011

HONORABLE ANDREW L. CARTER
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

22

## ATTACHMENT A

## DESCRIPTION OF PREMISES TO BE SEARCHED

(35-05/35-11 Farrington Street, Flushing, New York 11354)



The SUBJECT PREMISES is located in a two-story tan building on 35-05/35-11 Farrington Street, Flushing, New York between 35th Avenue and Northern Boulevard.  The entrance door clearly marks "35-05 and 35-11" in white writing to the left of the glass door.  Above the main entrance is a sign containing the words, "United Disabilities Welfare Center."  Located on top of the tan building is a large white sign containing the words, "URI Medical Center," and located to the left of the tan building is large rectangular sign containing the words, "URI Medical Center." The SUBJECT PREMISES also has a basement.

23

## ATTACHMENT B

### ITEMS TO BE SEIZED

Unless otherwise specified, any and all of the following named records, documents, items and information concerning URI. This information may be stored or filed and includes any format in which the information may exist:

1.     Documents constituting, concerning, or relating to patient files, bills, invoices, and claims for payment/reimbursement for services billed, provided, or alleged to have been provided to patients to include, but not limited to, reimbursement claim forms (under Medicaid and Medicare), explanations of medical benefits, dispensing orders, detailed written orders or prescriptions, certificates of medical necessity, information from the treating physician(s) concerning the patients' diagnosis, and proof of delivery of services and/or items that were submitted by any representative acting on behalf of URI or for reimbursement by Medicare and Medicaid.

2.     All contracts, agreements, papers, and affiliated records constituting, concerning, or relating to providing of physical therapy and other diagnostic services by Ho Ki, Hoi Kam, Peter Lu, and John Knox, URI, or any representative acting on their behalf, to include, but not limited to, manufacturer catalogs, purchase orders, invoices, and receipts.

24

3.    All letters constituting, concerning, or relating to efforts to collect co-payments and/or deductibles for individuals that receive health care coverage from Medicare and Medicaid.

4.    All correspondence and cancelled checks relating to notice of overpayment and request for refunds from Medicare and Medicaid.

5.    All correspondence to and from Medicare and Medicaid including, but not limited to, manuals, advisories, newsletters, bulletins, and publications.

6.    All correspondence to and from patients regarding Medicare and Medicaid.

7.    Financial books and records and documents constituting, concerning, or relating to Ho Kim, Hoi Yat Kam, Elaine Kim, also known as So Ryang Kim, Peter Lu, John Knox or URI.

(a)    Bank Accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds or bond fund; Including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, loan statements, loan agreements; and

(b)    Credit card/ATM/debit card accounts.

8.    All contracts, agreements, logs, lists or papers affiliated with any medical professional services, referrals, or storage for URI or Ho Kim, Hoi Yat Kam, Peter Lu, John Knox, Elaine Kim, also known as So Ryang Kim, and Gilbert Kim, to include, but

25

not limited to, records of payment by URI or the Ho Kim, Hoi Yat Kam, John Knox, Peter Lu, Elaine Kim, also known as So Ryang Kim, and Gilbert Kim.

9.   All URI employee files and resumes.   This may include, but not limited to, any handwritten or computer files listing any and all employee names addresses, telephone numbers, and background information for all current and former employees;

10.   All contracts, agreements or paper affiliated with any outside medical insurance billing company for URI or the Ho Kim, Hoi Yat Kam, John Knox, Peter Lu, Elaine Kim, also known as So Ryang Kim and Gilbert Kim.

11.   Additionally, all computer equipment and the items, listed above, which are contained in any computer equipment as follows, and pertain to the above listed persons, business, or entities:

(a)   Computer equipment, including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data.   These devices include but are not limited to any data-processing hardware (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook"computers); internal and peripheral storage devices (such as laser disks, fixed disks, external hard disks, floppy disk drives and diskettes, tape

26

drives and tapes, optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks);

(b)   Information, instructions, programs or program code, stored in the form of electronic, magnetic, optical, or other media which are capable of being interpreted by a computer of its related components, data, data fragments or control characters integral to the operation of computer software, operating system software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended for use to communicate with computer components;

(c)   Any written, recorded, printed or electronically stored material which explains or illustrates the configuration or use of any seized hardware, software, or related item;

(d)   Devices, programs, or data-whether themselves in the nature of hardware of software-that can be used or is

27

designed for use to restrict access to or facilitate concealment of any computer hardware, computer software, computer-related documentation, electronic data, records documents or materials within the scope of this application, any data security hardware(such as any encryption devices, chips and circuit boards),passwords, data security software of information (such as test keys and encryption codes), and similar information that is required to access computer or data or to otherwise render programs or data into a useable form;

   (e)  Any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer-related equipment.  This media includes but is not limited to any fixed disks, external hard disks, removable hard disk cartridges, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, laser disks, or other memory storage devices;

   (f)  Any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph records, printing, or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs), or any information on an electronic or magnetic storage device (such as

28

floppy diskettes, hard disks, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks),as well as printouts or readouts from any magnetic storage device.

(g)  Any and all communications previously received or transmitted, or prepared in contemplation of transmission, including electronic mail or data associated with electronic bulletin board systems, stored on any of the electronic media named above.  All electronic communications, including those previously received or transmitted, or held in temporary, intermediate storage incident to transmission, documents, and materials, including those used to facilitate communications, as used above shall include any and all communications previously received, transmitted, or stored, or prepared in contemplation of transmission, including electronic mail or data associated with electronic bulletin board systems, whether stored on any of the electronic media named above or held in temporary, intermediate storage incident to transmission to the individuals or premises within the scope of this application.

(h)  Any and all electronic information or electronic data, stored in any form, which is used or has been prepared for use either for periodic or random back-up (whether deliberate or inadvertent, or automatically or manually initiated), or any computer or computer system, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks,

29

videocassettes, and other media capable or storing magnetic or optical coding.

(i)   Such electronic data in the form of electronic records, documents, and materials, including those used to facilitate communication;

(j)        "Hidden", erased, compressed, password-protected, or encrypted files;

(k)   "Mainframe" computers, or of "micro" or "personal"computers, either standing alone or joined through a series of connected computers called a "network";

(l)   All magnetic storage devices as well as the central processing units (CPUs) and applicable keyboards and monitors which are an integral part of the processing unit; and

(m)   Various file "directories" and the individual files they contain, recently deleted data; scanning storage areas for deliberately hidden files; all of which constitute evidence, fruits and instrumentalities of violations and attempted violations of, <u>inter alia</u>, Title 18, United States Code, Section 1347 (Health Care Fraud); and Title 18, United States Code, Section 1349 (Health Care Fraud Conspiracy).